UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELAYSSANDRIA LACY,

Plaintiff,

v.

MARKETPLACE ACQUISITIONS,
LLC D/B/A MARKET PLACES
HOMES, LLC, TROWBRIDGE
REALTY CORPORATION AND
STANLEY B. DICKSON JR.

Defendants.

_____/

Case No. 21-12312

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 37]

### I.    Introduction

Plaintiff Elayssandria Lacy filed this lawsuit on September 30, 2021. The Second

Amended  Complaint  alleges  three  counts:  (1)  Independent  Contractor

Misclassification  under  the  Fair  Labor  Standards  Act  ("FLSA")  (Count  I);  (2)

Retaliation under the FLSA (Count II); and (3) violation of the Michigan Whistle

Blower  Protection  Act  ("WPA")  (Count  III).  It  names  three  Defendants:  (1)

Marketplace  Acquisitions,  LLC  d/b/a  Marketplace  Homes  ("Marketplace

Acquisitions");  (2)  the  Resident  Agent  of  Marketplace  Acquisitions,  Stanley  B.

Dickson Jr. ("Dickson"); and (3) Trowbridge Realty Corporation ("Trowbridge Realty"). Dickson was also the President of Trowbridge. [ECF No. 8].

On March 9, 2023, Defense Counsel, Trowbridge Law Firm, PC, filed a Motion for Summary Judgment on behalf of all Defendants. Plaintiff responded on March 30, 2023. Defendants filed a reply on June 23, 2023, and Plaintiffs filed a Sur-Reply on June 29, 2023. The Court heard oral argument on July 11, 2023. The Motion for Summary Judgment is fully briefed.

For the reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

## II.    Factual Background

Plaintiff is a licensed real estate agent in three states. [ECF No. 38-1, PageID.637]. She testified in her deposition that she was hired by Marketplace Housing, LLC, a real estate and property management company, as a W-2 employee on March 4, 2014. [ECF No. 38-1, PageID.638]. Plaintiff claimed that, in 2019, Marketplace Housing classified her as a 1099 independent contractor. [ECF No. 38-1, PageID.639]. In January 2019, a company with a letterhead bearing the name "Marketplace Homes", sent her a letter offering her a "Leasing and Listing Specialist" position ("Offer Letter"). [ECF No. 37-1, PageID.591-92]. The letter was signed by Marketplace Homes's Managing Partner Mike Kalis. [Id]. It stated,

> We are offering to invite you to work with Marketplace Homes as a Leasing and Listing Specialist. This letter shall serve as an outline of

2

what your agreement will entail. The following are most of the details as we currently know them:

1. You are being offered a contractor agreement as a Leasing and Listing Specialist with the anticipated start date of 1/10/2019. Your Real Estate License will be held at Marketplace Homes.

2. You will report to Nick Tucker, manager of Leasing and Listing.

3. Primary responsibility will be to fill rental properties and sell homes within the organization . . .

4. Your pay will include the following:

   a. Commissions break down to multiple categories (subject to change with notice) . . .

5. Your contract is effective upon acceptance of the agreement . . ..

[ECF No. 37-1, PageID.591-92]. The letter indicated that Marketplace Homes would cover all real estate fees, Multiple Service ("MLS") fees, and continuing education fees. [Id]. Plaintiff accepted the position and Marketplace Homes provided Plaintiff with office space and necessary technology to conduct her work. [Id]. In January 2019, Plaintiff alleges that she began work for Marketplace Homes at the office space located at 1380 East Jefferson. [ECF No. 38-1, PageID.642]. She was required to work 10am- 6pm and was paid by commission. [Id].

In February 2020, Plaintiff entered an Independent Contractor Agreement with Trowbridge. [ECF No. 37-1, PageID.548]. She maintains, however, that she continued to use the same office building at 1380 Jefferson and was told that she worked for Trowbridge beginning in January 2019 until she was terminated in

3

September 2021. [ECF No. 38-1, PageID.640-42]. During her time with Trowbridge, Plaintiff had two supervisors: Trowbridge Leasing Manager Elyse Sarnecky and an individual named "Nick." [ECF No. 38-1, PageID.640]. Plaintiff presented evidence testified that her supervisors routinely monitored and inspected her work.

On August 25, 2021, Plaintiff's counsel sent Marketplace Homes a demand letter addressed to its putative President "Will Dickson". [ECF No. 38-11]. On behalf of Plaintiff, the letter complained that she was misclassified as an independent contractor for the last two years (January 2019-2021) and did not receive overtime pay. [ECF No. 38-11, PageID.611]. Shortly after Plaintiff sent her demand letter, on September 1, 2021, "William Dickson" sent Plaintiff correspondence stating, "to confirm, you no longer have any employment capacity with Marketplace Homes." [ECF No. 38-12, PageID.738]. With no further explanation, William Dickson signed the correspondence as President of Marketplace Homes.

Trowbridge alleges that the relationship between Trowbridge and Plaintiff ended in September 2021, due to Plaintiff's poor work performance. [ECF No. 37, PageID.734].

III.    **Applicable Law and Analysis**

**A. Summary Judgment Standard**

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists. *Bennett v. City of Eastp*ointe, 410 F.3d 810, 817 (6th Cir. 2005) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The question on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249).

Defendants argue that summary judgment should be granted on all claims because: (1) Marketplace Acquisitions and Stanley Dickson are not proper Defendants given that Plaintiff never had a working relationship of any kind with Marketplace Acquisitions or Stanley Dickson and Marketplace Acquisitions never held itself out as doing business as Marketplace Homes; (2) Plaintiff had an independent contractor relationship with Trowbridge; and (3) Plaintiff was allegedly fired due to poor and unethical work performance. [ECF No. 37, PageID.545]; [ECF No. 48, PageID.863].

### B. Whether Marketplace Acquisitions, LLC d/b/a Marketplace Homes and Stanley B. Dickson Are Proper Defendants

#### 1. Marketplace Acquisitions, LLC d/b/a Marketplace Homes

Plaintiff clearly alleges that a working relationship existed between Marketplace Homes, LLC, and herself between January 2019 and February 2020. See Plaintiff's Deposition Transcript [ECF No. 38-1, PageID.639-40] (stating that ". . . in 2019 we received those new owners. And we were still under Marketplace Homes, but I was under the impression that the company was now under somebody else's control."). Her testimony also acknowledges that she signed an Independent Contractor Agreement with Trowbridge in February 2020. [Id].

Defendants attach as an exhibit the Marketplace Acquisitions' webpage from the Department of Licensing and Regulatory Affairs ("LARA"). [ECF No. 37-1, PageID.588]. It shows no connection to Marketplace Homes, LLC or Marketplace

6

Housing, LLC. Citing the affidavit of Stanley Dickson, Defendants say Plaintiff never had a working relationship with Marketplace Acquisitions or Stanley Dickson as an "employee, independent contractor, or otherwise" and that Marketplace Acquisitions, LLC never operated or did business as Marketplace Homes, LLC. [ECF No. 37-1, PageID.554-55]. Further, Defendants submit a LARA webpage for an entity named Marketplace Homes, LLC that was dissolved in 2010, before Plaintiff was allegedly hired by an entity bearing the same name. Mike Kalis is listed as a Resident Agent for Marketplace Homes. [ECF No. 37-1, PageID.585]. An individual by this same name also sent Plaintiff the previously mentioned Offer Letter on behalf of Marketplace Homes.

Defendants say Plaintiff does not produce any evidence showing that Marketplace Acquisitions ever did business as Marketplace Homes. Plaintiff's only rebuttal is raised in a sur-reply, where Plaintiff argues that Marketplace Acquisitions and Stanley B. Dickson are proper defendants because, "Defendants cannot fashion their motion pursuant to Fed. R. Civ. P. 56 as a motion pursuant to Fed. R. Civ. P. 12(b), and they waived their right to do so because they all undertook 'voluntary, active, and extensive' participation in the case over the past fifteen months, thereby representing that they would 'defend the suit on the merits,'" [ECF No. 49, PageID.908]. Plaintiff relies on *Pravettone v. Cargotec Oyj*, No. 13-11716, 2013 WL 3936467, at *5 (E.D. Mich. July 30, 2013).

7

In *Pravettone*, the court discussed waiver of a personal jurisdiction defense. *Id*. In that case a corporate defendant retained local counsel, and informed plaintiff that it did not consent to personal jurisdiction and was not filing an answer but was instead filing a motion to dismiss for lack of personal jurisdiction. *Id*. Later that same day, defendant sought timely removal to federal court from state court and its attorneys filed appearances. *Id*. Defendant filed its Rule 12(b)(2) motion to dismiss, the court held a status conference with the parties, at which the pending motions were discussed, including setting a briefing schedule for plaintiffs' response and defendants' reply. Counsel for defendant also requested a stay of merits discovery until the jurisdictional issue was resolved. *Id*. Under these circumstances, the court held that defendant did not waive the right to contest personal jurisdiction simply because its attorney filed a general appearance. *Id*. It reasoned that simply filing a general appearance was not enough to give plaintiff a "reasonable expectation that the defendant, based on its conduct, would defend the suit on the merits or that the court expended wasted effort." *Id*. at *6 (internal quotations omitted).

Regardless of whether Plaintiff believed Marketplace Acquisitions would defend the suit on the merits, *Pravettone* is distinguishable because Marketplace Acquisitions is not asserting a personal jurisdiction defense and it asserted in its Response to Plaintiff's Second Amended Complaint and Jury Demand that "Marketplace Acquisitions LLC, . . . never did business as Marketplace Homes, LLC

8

and never did business in the real estate and property management industry." [ECF No. 27, PageID.165].

Clearly, Marketplace Homes, LLC is the entity involved in the circumstances of this case. Plaintiff has proffered no evidence connecting Marketplace Acquisitions to Plaintiff as a putative employer. And Plaintiff produces no evidence to connect Marketplace Acquisitions to Marketplace Homes, LLC or Marketplace Housing, LLC. Thus, Defendants' Motion for Summary Judgment is **GRANTED IN PART** with respect to Marketplace Acquisitions, LLC.

At oral argument, Plaintiff raised concern that it would essentially be unfair to dismiss Market Acquisitions at this late stage in the litigation. Though Plaintiff seems to acknowledge that Marketplace Acquisitions is the wrong party, she did not seek leave to amend the complaint under Fed. R. Civ. P. 15(c)(1)(C), which permits amendment to relate back when a plaintiff seeks to substitute a correct party for a previously improperly named defendant. *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 557 (2010); see *Solis v. Cap. Grille Holdings, Inc.*, No. 1:17-CV-00798, 2020 WL 7698167, at *4 (S.D. Ohio Dec. 28, 2020). Plaintiff has yet to file such a motion.

### 2.  Stanley B. Dickson Jr.

Unlike Market Acquisitions, Dickson is not the wrong party. Plaintiff's search of Michigan's LARA database revealed that Stanley B. Dickson is listed as corporate officer for several positions at Trowbridge. [ECF No. 38-8, PageID.723]. Corporate

officers may face personal liability under certain circumstances. The Sixth Circuit has held that a corporation's president/co-owner, who has "operational control" over the corporation, may be an "employer" within meaning of FLSA and chargeable with personal liability for failure to comply with FLSA. See *Rhea v. W. Tennessee Violent Crime & Drug Task Force*, 825 F. App'x 272, 275 (6th Cir. 2020); *U.S. Dep't of Lab. v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995); and *Merriwether v. Temple Plaza Hotel, Inc.*, No. 19-11854, 2022 WL 1522089, at *4 (E.D. Mich. May 13, 2022); see also *Crowell v. M St. Ent., LLC*, No. 3:21-CV-00517, 2023 WL 3079419, at *8 (M.D. Tenn. Apr. 25, 2023) (citing *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994), (cert. denied, 513 U.S. 875) ((holding that an individual who "controlled significant functions of the business, and determined salaries and made hiring decisions" was an employer)).

"Operational control [may be] present where a person: (1) is an officer of a corporation, (2) has a significant ownership interest in it, (3) controls significant functions of the business, and (4) determines salaries and makes hiring decisions." See *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991) (superseded by statute on other grounds) (holding that a corporate officer who owned 100% of the stock of a travel company was an employer because he was "involved in the business operations of the corporation," "controlled the purse strings of the

corporation," and "had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries").

Defendants' brief discusses their reasons for arguing that Plaintiff was an independent contractor, but it does not dedicate pertinent analysis to whether Stanley B. Dickson Jr. was an "employer" under the FLSA, 29 U.S.C. § 203(d) and it does not discuss his operational control of Trowbridge. It is true that Plaintiff testified that she never asked if she individually worked for Dickson, and she never received any form of compensation form him directly. [ECF No. 37-1, PageID.562]. However, these facts, even if there accepted as true do not entitle Dickson to summary judgment because, if he had the requisite level of operational control over Trowbridge, he could still be held personally liable for Trowbridge's failure to comply with the FLSA, even though no one told her Dickson was her employer and he did not compensate her personally.

Defendants have not carried their burden in showing the absence of a genuine material fact regarding Dickson's operational control over Trowbridge or his status as Plaintiff's putative employer within the meaning of FLSA. Further, Defendants do not advance a viable legal theory for why Stanley B. Dickson is not a "proper" defendant and the Court will not grant summary judgment on that ground.

Next, the Court will discuss whether Dickson and Trowbridge were Plaintiff's "employers" under the FLSA, the WPA, and whether her claims against them may survive summary judgment.

### C. Fair Labor Standards Act

#### 1. Applicable Law

FLSA requires employers to compensate nonexempt employees at least minimum wage for all hours worked, and at the premium rate of one and one-half times their base rate of pay for hours worked over 40 in a week ("overtime pay"). 29 U.S.C § 206(a), 207(a). Under the FLSA, only employees are entitled to overtime and minimum-wage compensation. See *Ellington v. City of E. Cleveland*, 689 F.3d 549, 553 (6th Cir. 2012). Independent contractors do not enjoy FLSA's protections. *Acosta v. Off Duty Police Servs., Inc*., 915 F.3d 1050, 1055 (6th Cir. 2019) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)).

To carry out the remedial purpose of the FLSA, the Court must examine whether a business has misclassified an employee as an independent contractor. *Id*. See also *Lilley v. BTM Corp*., 958 F.2d 746, 750 n. 1 (6th Cir.1992). The Supreme Court has recognized, however, that businesses are liable to workers for overtime wages even if the company "put[s] ... an 'independent contractor' label" on a worker whose duties "follow[ ] the usual path of an employee." *Acosta*, 915 F.3d at 1055. Contractual intention is not a dispositive consideration in a court's analysis of

whether a worker is an employee or an independent contractor, since the FLSA is designed to defeat rather than implement contractual arrangements. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 808 (6th Cir. 2015).[1]

Whether an individual or an entity is an "employee" within the meaning of the FLSA is a fact-intensive inquiry focused on the "economic realities' of the relationship." *Ellington*, 689 F.3d at 555. The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). According to the FLSA, "'[e]mploy' includes to suffer or permit to work." *Id*. § 203(g). The Sixth Circuit has interpreted this framework to set forth a standard under the "economic realities" test: "'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir.1984) (quoting *Dunlop v. Carriage Carpet Co*., 548 F.2d 139, 145 (6th Cir.1977)). The Sixth Circuit applies six factors to consider in determining employment status:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; ... 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] ...[6] ] whether the service rendered is an integral part of the alleged employer's business.

---

[1] Based on this authority, the Court finds that the independent contractor agreement, while relevant in the economic realities analysis, is not controlling for determining whether an entity is an "employer" under the FLSA.

*Acosta.*, 915 F.3d at 1055 (internal quotes omitted); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (citing *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984). This approach, initially stated in *Brandel* and adopted by the Sixth Circuit in numerous other cases, is the "law of our circuit." *Keller*, 781 F.3d at 817 (Norris, CJ., dissenting). Courts have also considered whether the business had "authority to hire or fire the plaintiff," and whether the defendant-company "maintains the plaintiff's employment records." *Ellington*, 689 F.3d at 555.

Noting the "striking breadth" of the FLSA's expansive definition of "employ," the Supreme Court has stated that this definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (distinguishing the scope of "employee" under ERISA as not being as broad as it is under the FLSA));

Determining employer status under the FLSA is a question of law. *Dole*, 942 F.2d at 965. None of the factors is determinative on its own, and each must be considered "with an eye toward the ultimate question—[the worker's] economic dependence on or independence from" the alleged employer. *Acosta*, 915 F.3d at 1055. See also *Brandel*, 736 F.2d at 1116 ("the employment relationship does not

lend itself to a precise test but is to be determined on a case-by-case basis upon the circumstances of the whole business activity").

### 2.  Analysis Pertaining to Employer Status Under the FLSA

### a.  The Economic Realities Test Controls

Defendants argue that "FLSA's six factor test to determine whether a worker has been misclassified as an independent contractor should not be considered." [ECF No. 37, PageID.545]. Indeed, their brief dedicates little to no analysis to the economic realities test factors. Though they concede that the economic realities test is commonly used in Sixth Circuit FLSA cases, Defendants urge the Court to adopt a different approach based on definitions of "employee" described in portions of the Internal Revenue Code (IRC) and under state law.

Defendants cite *Smith v. Town & Country Props*. 338 Mich. App. 462, 466 (2021) appeal denied, 509 Mich. 1086, 975 N.W.2d 928 (2022). In *Smith*, the Michigan Court of Appeals upheld a grant of summary judgment in a common law wrongful discharge case brought under state law, finding that an associate real estate broker's relationship with a real estate business met statutory definition of "independent contractor relationship" under Real Estate Brokers Act (REBA). *Id*. The court ruled that the real estate broker was an independent contractor rather than an employee. *Id*. at 473. The court reasoned that the definition of a real estate broker

under REBA controlled since it was defined by plain and clear statutory language. *Id.* at 475.

In addition to *Smith*, Defendants rely on other state law cases, the IRC (26 U.S.C § 3508), the REBA (MCL § 339.2501), and Michigan's Occupational Code. None of the authority defendants cite purports to stand for the proposition that a classification for income tax or state law occupational purposes may supplant the five-factor fact-intensive test used to determine whether—as a matter of economic reality—that individuals bringing FLSA claims are economically dependent upon the business to which they render their services. Section 3508 of the IRC does not inform the definition of "employee" under the FLSA. The IRC provision is limited by its unambiguous, plain language to federal taxation. 26 U.S.C. § 3508(a) ("For the purposes of this title ....") (emphasis added); see *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts ... is to enforce it according to its terms." (Citation omitted)). Section 3508's tax implications for employees do not conflict with the FLSA's requirements for employers. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (courts must give effect to both statutes absent the existence of clear congressional intent that one statute displaces the other). "[I]n determining who are 'employees' under the [FLSA], ... employer-employee classifications under other statutes are not of

controlling significance." *Walling v. Portland Terminal* Co., 330 U.S. 148, 150 (1947).

For purposes of determining employee status under the FLSA, neither classification of an "employer" under the IRC, the REBA, or Michigan's occupational code controls. Further the Sixth Circuit has not instructed that district courts must consider state law and IRS classifications of an "employer" as part of the economic realities test factors. Thus, the Court rejects Defendants' arguments for adopting a standard different from the economic realities test as it pertains to Plaintiff's FLSA claims.

As such, the Court will discuss each factor of the economic realities test, whether Trowbridge—and by extension, Dickson—are "employers" under the FLSA, and whether genuine issues of material fact remain regarding Plaintiff's misclassification and retaliation claims.

### b. Economic Realities Test Factors

### i.  Permanency of the Relationship Between the Parties

The first factor supports finding that Trowbridge was an employer. This factor looks to the "length and regularity of the working relationship between the parties." *Acosta*, 915 F.3d at 1057 (citing *Keller*, 781 F.3d at 807 (citation omitted)). Independent contractors "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work

for only one employer and such relationship is continuous and indefinite in duration." *Keller, 781 F.3d at 807* (internal quotation marks omitted) (quoting *Baker v. Flint Eng'g & Constr. Co*., 137 F.3d 1436, 1442 (10th Cir. 1998)). That a party works for more than one company, however, is only "one factor of many to consider in determining whether a worker is economically dependent upon the defendant company," and "employees may work for more than one employer without losing their benefits under the FLSA." *Id*. at 808 (internal citations omitted).

Plaintiff testified that she worked for Trowbridge at their office space at 1380 Jefferson Ave beginning from 2019 until she was terminated in 2021. [ECF No. 38-1, PageID.642]. This three-year work period favors a fixed employment relationship. See *Acosta*, 915 F.3d at 1057 (work over a period of years showed employee status); *Hobbs v. Petroplex Pipe & Constr., Inc*., 946 F.3d 824, 835 (5th Cir. 2020) ("employee" status where plaintiff worked for "almost" three years).

In 2020, Trowbridge and Plaintiff signed an independent contractor agreement. That agreement indicated the parties did not intend for Plaintiff be treat "or otherwise considered as an employee." [ECF No. 37-1, PageID.548]. It authorized Plaintiff to use Trowbridge's office facilities for performance of the Agent's services but that the Agent was responsible for her own taxes, fees, expenses, and "governmental liabilities." [Id]. The agreement also contained what can be construed as a noncompete agreement. [Id. at PageID.549]. A noncompete

clause of an independent contractor agreement weighs in favor of viewing an alleged independent contractor as an employee. See *Swinney v. AMcomm Telecommunications, Inc*., 30 F. Supp. 3d 629, 634 (E.D. Mich. 2014) (holding that a noncompete provision of an independent contractor agreement favors finding that plaintiff technicians were employees of company) (citing *Harris v. Skokie Maid and Cleaning Serv., Ltd*., 11–8688, 2013 WL 3506149, at *9 (N.D.Ill. July 11, 2013) and noting an unpublished Third Circuit case which held that the non-compete provision weighed in favor of considering the plaintiff maids as employees rather than independent contractors).

Trowbridge disputes that Plaintiff began working for Trowbridge in 2019, suggesting that the independent contractor agreement marked the beginning of the working relationship. There is a genuine issue of material fact regarding when Plaintiff first began her putative employment at Trowbridge and when she began working in its office. Viewing the facts in the light most favorable to Plaintiff a reasonable jury could conclude that first factor indicates that Plaintiff was treated more like an employee than an independent contractor. This is true even though Plaintiff was undisputedly paid in commission and her tax forms indicated that she was classified an independent contractor for tax purposes from 2019-2021.

19

### ii.     The Degree of Skill Required for the Rendering of the Services

" 'Skills are not the monopoly of independent contractors.' " *Keller*, 781 F.3d at 809 (quoting *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)). The inquiry is focused on whether an individual's profits increased because of the " 'initiative, judgment[,] or foresight of the typical independent contractor,' or whether his work 'was more like piecework.' " *Id*. (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). The Sixth Circuit has noted that "[i]t is also important to ask how the worker acquired his skill." *Id*. (citing *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1318 (11th Cir. 2013) ). An independent contractor is more likely to have gained the relevant skill though "formal education, an apprenticeship, or years of experience." *Id*. However, "if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job," the worker is more likely an employee. *Id*.; See also *Benion v. LeCom, Inc*., 336 F. Supp. 3d 829, 849 (E.D. Mich. 2018) (citing *Keller*, 781 F.3d at 809) (internal citations omitted).

Plaintiff testified that her job duties at Trowbridge included: touring perspective tenants through homes virtually, accepting the applications, reviewing the information, verifying income, putting the lease together, collecting move-in funds, accounting, setting up the ledger, and setting up renter's insurance. [ECF No. 38-1, PageID.643]. Though she testifies to having never worked for a real estate

20

agency before she joined Marketplace Homes in 2014, she worked as a Quicken Loans resolution analyst and she obtained her real estate license in 1999. Thus, Plaintiff had a real estate license and experience working at a real estate agency for at least five years before allegedly joining Trowbridge in 2019. This factor weighs against finding employee status.

### iii.    The Worker's Investment in Equipment or Materials for the Task

This factor requires comparison of the worker's total investment to "the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Keller*, 781 F.3d at 810. And a worker's investment in a "common item that most people use daily" signals less economic independence. *Id*. This factor is "most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the [company] to accomplish the task." Id. (Citing *Brandel*, 736 F.2d at 1119.

In *Keller* plaintiff "drove to and from installation jobs in his wife's van" and purchased common items to perform his job, including a printer, a smartphone, and a digital camera. *Keller*, 781 F.3d at 811. The court denied summary judgment, noting that Plaintiff also did not invest in specialized equipment or materials showing economic independence.

Plaintiff paid her own real estate license fees, continuing education fees, and other expenses designated as payable by Plaintiff in the independent contractor agreement. Trowbridge provided technology, software, an office, and equipment for the job. Based on the lack of any evidence produced that Plaintiff paid for equipment or other items required for the job, the Court concludes that her financial investment in her real estate licenses and related fees was minor enough in comparison with Trowbridge's overall investment in connection with her employment to suggest that she was a FLSA employee. See *Doe v. Cin–Lan, Inc.*, No. 08–CV–12719, 2008 WL 4960170, at *13–14 (E.D.Mich. Nov. 20, 2008) ("[plaintiff] is likely to be able to show that her investment is small enough to indicate that she is an employee rather than an independent contractor. Although it may not be entirely *de minimis*, due in part to some of the expenses pointed out by defendants, the fact remains that any [employee at defendant company] is likely to pay only a small portion of the overall costs required for her work.").

Plaintiff foots the bill for a relatively small portion of the costs required for her work. Plaintiff asserts, and Defendant does not dispute, that at most, she used her cell phone for work. Factor three weights in favor of employee status.

### iv.   The Worker's Opportunity for Profit or Loss, Depending Upon his Skill

"'The extent to which an individual is able to 'generate more money based on skill and hard work' may tend to establish independent contractor status.'" *Swinney*, 30 F. Supp. 3d at 645 (quoting *Scruggs v. Skylink, Ltd*., No. CIV.A. 3:10-0789, 2011 WL 6026152, at *6 (S.D.W. Va. Dec. 2, 2011).

Plaintiff was paid by commission from Trowbridge, which could suggest a greater ability to generate more money based on skill and hard work of leasing and closing properties. However, Plaintiff suggests that she worked approximately 10:00 a.m. to 6:00 p.m. and often worked over 40 hours a week, leaving little time for deviation to generate more pay. Sarnecky testified that she assigned properties to Plaintiff and could unilaterally reduce or increase her workload. Viewing the facts in the light most favorable to Plaintiff, they suggest that Trowbridge controlled the overall amount of commission Plaintiff could earn by exercising discretion over the number of properties she worked on. This leaves little room for profit or loss based on skill. A genuine issue of material fact remains regarding whether Plaintiff or other workers in Plaintiff's position were assigned to varying numbers of commission-earning properties based on their skill.

**v.    The Degree of the Alleged Employer's Right to Control the Manner in Which the Work is Performed**

On the fifth factor, the facts, viewed in the light most favorable to Plaintiff, suggest that Trowbridge controlled Plaintiff's job duties, Plaintiff also testified that she was required by Trowbridge to work 10am – 6pm but would be required to take work phone calls until 8:00pm. [ECF No. 38-1, PageID.643]. She worked in Trowbridge's offices and from home on certain days during the COVID-19 pandemic. Trowbridge dictated the hours and the days she was required to come into the office or work from home. [ECF No. 38-1, PageID.646]. Trowbridge also allegedly required Plaintiff to attend team meetings at the company about properties, property status, new properties, and new programs being introduced them. [Id].

Plaintiff testified that Trowbridge also provided standard operating procedures for the leasing team, email templates, and dictated her job duties. [Id]. She testified that her supervisor "forced" her to use a spreadsheet for her work, even though she initially declined. [Id]. She was required to follow policies and procedures, including an Employee Handbook, a Personal Conduct and Discipline Policy, and Standard Operating Procedures. Plaintiff's Independent Contractor Agreement stated that she must conduct her business in compliance with established "policies and procedures." [ECF No. 37-1, PageID 548]. A genuine issue of material fact exists as to whether Plaintiff was required to abide by a discipline policy and standard operating procedures imposed by Trowbridge.

24

Plaintiff was closely supervised and her work frequently inspected, first by Mr. Tucker and then by Ms. Sarnecky. Sarnecky conducted weekly audits, had the ability to increase or decrease workload, and review Plaintiff's phone records. [ECF No. 38-3, PageID.669]. Lastly, Plaintiff's testified that she did not work any other jobs during her time at Trowbridge, although it is unclear whether Plaintiff was obliged to accept every assignment and duty offered by Trowbridge. There is a genuine issue of material fact regarding whether Plaintiff had sufficient control over her working relationship with Trowbridge to render her an independent contractor.

In this instance, Plaintiff is distinguishable from the plaintiff in *Keller*, where the Sixth Circuit granted summary judgment and noted that the plaintiff *Keller's* decision to accept a high number of jobs with the company (rendering him unable to perform outside work) speaks more to his own business decisions—where to live, how much money to earn—than the duties imposed by the employer. Factor five weighs in favor of employee status.

### vi.     Whether the Service Rendered is an Integral Part of the Alleged Employer's Business

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Acosta*, 915 F.3d at 1057.

Plaintiff's job duties included calling homeowners, accepting, and reviewing tenancy applications, verifying tenant information, calculating tenant income, and

building leases using specific property management software provided by Trowbridge, a real estate sales and property management entity. Trowbridge does not dispute that Plaintiff's work was integral to its business. This factor also weighs in favor of employee status.

Applying all the relevant factors and considering the evidence presented in the light most favorable to Plaintiff, the Court concludes that Plaintiff has raised a genuine issue of material fact regarding the level of economic dependence she held with Trowbridge. Based on the level of economic dependence Plaintiff shows, a reasonable jury could conclude that she was an employee within the meaning of FLSA, rather than an independent contractor.

### D. Applicable Law and Analysis For Counts II and III

In addition to their arguments pertaining to Market Acquisitions and Dickson discussed above, Trowbridge's motion for summary judgment focuses almost exclusively on the issue of whether Trowbridge is an employer. However, in the reply brief Defendants argue, for the first time, that Plaintiff was terminated for poor performance, which is a nondiscriminatory reason for her termination. Defendants' argument addresses only the retaliation claim Plaintiff brings under the FLSA (Count II), and the WPA claim for wrongful discharge (Count III). Much of the Defendants' briefing lumps together the analyses pertaining to the FLSA retaliation claim and the WPA claim without addressing all the elements of each claim

individually. Thus, in sections one and two below, the Court will describe the law applicable to each claim; and in section three, the Court will analyze both claims together.

### 1. Applicable Law Regarding FLSA Retaliation Claim

To establish a prima facie case of retaliation under the Fair Labor Standards Act (FLSA) an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482 (6th Cir. 2006)*; Cruz v. Don Pancho Mkt., LLC*, 167 F. Supp. 3d 902 (W.D. Mich. 2016); 29 U.S.C. § 215(a).

Once Plaintiff establishes a prima facie case, Defendants then must set forth a "legitimate, non-discriminatory reason for the adverse employment action." *Adair*, 452 F.3d at 490-91. To satisfy this burden, Plaintiff show that "the defendant's proffered reasons were not its true reasons, but merely a pretext." *Id*. To raise a genuine issue of fact as to pretext and defeat a summary judgment motion, a plaintiff must produce evidence to support a finding that: (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate defendants' action, or (3) the proffered reason was insufficient to motivate the action. *Id*.

27

The Court will now discuss the law applicable to Plaintiff's WPA claim.

### 2. Applicable Law Regarding WPA Claim

Section 2 of the Michigan Whistleblowers' Protection Act ("WPA"), which

provides in pertinent part:

> An employer shall not discharge ... an employee ... because the
> employee, or a person acting on behalf of the employee, reports or is
> about to report, verbally or in writing, a violation or a suspected
> violation of a law or regulation or rule promulgated pursuant to law of
> this state, a political subdivision of this state, or the United States to a
> public body.

M.C.L 15.362. To prevail on claim under Michigan's Whistleblowers' Protection Act

(WPA), plaintiff must demonstrate that (1) she was engaged in protected activity as

defined by the Act, (2) the defendant discharged her, and (3) a causal connection

exists between the protected activity and the discharge. *Cooney v. Bob Evans Farms,*

*Inc.*, 645 F. Supp. 2d 620 (E.D. Mich. 2009), aff'd, 395 F. App'x 176 (6th Cir. 2010);

M.C.L §15.361 et seq. Actions under the WPA are analyzed using burden-shifting

framework utilized in retaliatory discharge actions under Title VII. *Taylor v. Modern*

*Engineering, Inc.*, 252 Mich.App. 655, 662, 653 N.W.2d 625, 630 (2002).

### 3. Analysis

Without addressing the specific elements pertaining to either claim or the burden

shifting framework, Defendants argue only that Plaintiff was never an employee of

Trowbridge and that she was terminated for a non-discriminatory reason. Thus,

Defendant does not dispute that Plaintiff was engaged in protected activity when her

attorney sent a demand letter to "Will Dickson" President of Marketplace Homes, LLC on August 25, 2021, informing him that she was misclassified as an independent contractor from 2019-2021 and demanding overtime pay. [ECF No. 38-11, PageID.734]. It also stated, "If I do not hear from you or an agent on behalf of the Company by August 30, 2021, Ms. Lacy will proceed with a civil lawsuit." *Id.* Trowbridge does not dispute that it began a working relationship with Plaintiff as early as February 2020, which it terminated on September 1, 2021. Defendant also does not dispute that Plaintiff's engaged in protected activity and that the exercise of this right was known by Trowbridge at the time of termination. Plaintiff also proffered testimony suggesting that she thought Marketplace Homes and Trowbridge were connected.

> Q. And you understand that Marketplace Housing, LLC, and Trowbridge Realty Corporation are separate corporate entities; correct?
>
> A. No, I don't understand that. Like I explained to you before, I don't know anything about the inner workings of when they switched over. In 2000 -- at the end of 2018 we were told we were getting new owners, and --and 2019 we received those new owners. And we were still under Marketplace Homes, but I was under the impression that the company was now under somebody else's control.

He testimony suggests that she started working at Trowbridge's office in 2019-2021.

Trowbridge stated at oral argument that Plaintiff is confused about when she began her time at Trowbridge and when she began working in Trowbridge's office space at 1380 Jefferson. And yet Trowbridge does not make clear or produce

evidence showing whether it received Plaintiff's demand letter and whether it informed her that it was addressed to the wrong company. Trowbridge admits that it terminated its relationship with Plaintiff after she sent her demand letter, albeit for a "nondiscriminatory purpose." But it does not clarify or produce evidence showing that neither it or its President Stanley Dickson sent Plaintiff the above-mentioned termination letter signed as Will Dickson, president of Marketplace Homes.

The facts as evidenced by Plaintiff—and disputed by Defendant—raise more questions than they answer. The Court may take judicial notice of public documents and government documents. *Overall v. Ascension*, 23 F. Supp. 3d 816 (E.D. Mich. 2014); Fed. R. Evid. 201. A search of the Michigan Department of Licensing and Regulatory Affairs Corporations Online Filing System (LARA) reveals that an assumed name for Trowbridge is Marketplace Homes, created in 2020.[2] Plaintiff's testimony—in combination with other evidence in the record—and Trowbridge's LARA records allude to a connection between Marketplace Homes, Trowbridge, Marketplace Homes's putative "President" "Will Dickson," and Trowbridge President Stanley B. Dickson Jr. There is a genuine issue of material fact regarding

---

[2] See Trowbridge Realty Corporation, Michigan Dep't of Licensing and Regulatory Affairs, Corporations Online Filing System (July 10, 2023), https://cofs.lara.state.mi.us/CorpWeb/UAA/UAAAssumedNames.aspx?CID=M23 H13&PageType=VIEW

whether Plaintiff was engaged in protected activity and whether Trowbridge was aware of it at the time of her termination.

Further, Defendants do not rebut Plaintiff's argument suggesting that the temporal proximity between her exercise of protected activity and her termination is evidence sufficient to infer that the termination was caused by the exercise of protected activity. Trowbridge does say, however, that Plaintiff was terminated "based on her reported longstanding poor and unethical performance as a Real Estate and Leasing Agent for the company." [ECF No. 48, PageID.863]. According to Trowbridge, this unethical performance included falsifying documents, providing poor oversight, and failing to follow proper protocol with Trowbridge's homeowners." [ECF No. 48, PageID.863]. Plaintiff's former supervisor Elyse Sarnecky testified in her deposition that she had similar issues with Plaintiff during her time with Trowbridge.

Plaintiff was terminated a week after she sent her demand letter. "Although a plaintiff cannot rest solely on temporal proximity to establish pretext[,] suspicious timing is a strong indicator of pretext," *Wyatt v. Nissan North America*, Inc., 999 F.3d 400, 421 (6th Cir. 2021), Plaintiff produces independent evidence that could lead a reasonable jury to believe that Trowbridge's proffered non-discriminatory reason for terminating her was mere pretext. As Plaintiff points out, no evidence shows that Plaintiff ever received any formal discipline, such as "verbal warnings"

or "written warnings," including "Employee Disciplinary Action Forms," as described in the Marketplace Homes Employee Handbook. [ECF No. 38-5, PageID 694]. Sarnecky also testified:

Q. Do you know who decided to terminate Ms. Lacy?

A. I am unaware.

Q. Do you know why Ms. Lacy was terminated?

A. I was not a part of that discussion. I don't know who did it, and I truthfully don't even remember when it happened. I'm more of a day-to-day type of supervisor.

[ECF No. 48-1, PageID 885]. Her testimony leaves doubt as to the reason Plaintiff was terminated, suggesting that it may not have been because of poor performance. Plaintiff termination letter did not state a reason. She alleges that President William Dickson was the decisionmaker, and he terminated her a mere week after she engaged in protected activity.

Finally, Plaintiff correctly points out that Defendants fail to cite any record evidence supporting their contention that she sent the demand letter "in an effort to retain her position or receive some form of severance." [ECF No. 48, PageID.863]. Thus, as genuine issue of material fact remains as to pretext.

Reviewing the record in this case, the undisputed facts, and drawing all reasonable inferences in the light most favorable to the Plaintiff, the Court cannot

say that the matter is so one sided that Trowbridge or Stanley Dickson are entitled to judgment as a matter of law. Defendant is not entitled to summary judgment.

## IV.     Conclusion

Defendants' Motion for Summary Judgment is **GRANTED** with respect to Marketplace Acquisitions and **DENIED** with respect to Stanley Dickson Jr. and Trowbridge.

**IT IS SO ORDERED**

Dated:  July 27, 2023                                /s/Gershwin A. Drain
                                                                GERSHWIN A. DRAIN
                                                                United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 27, 2023, by electronic and/or ordinary mail.
/s/
Deputy Clerk